UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

TIMOTHY E. BUCHANAN )
)
V. ) NO. 2:14-CV-10
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is a judicial review of the Commissioner's final decision denying the plaintiff's application for disability insurance benefits under the Social Security Act following an administrative hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 13 and 17].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 46 years of age, a "younger" individual under the Social Security regulations, on the date he alleges he became disabled, February 24, 2010, and is now 51 years of age, a person "closely approaching advanced age." He has a high school education. There is no dispute that he cannot perform his past relevant work as a truck driver, which required medium exertion.

The plaintiff suffers from a variety of serious conditions. The ALJ found that plaintiff has a combination of severe impairments, which include type 2 diabetes; gout; degenerative disc disease in the lower back; left shoulder pain; obesity; mood disorder; pain disorder; anxiety disorder, and Meniere's disease. The Court takes notice that Meniere's disease is an inner ear disorder that affects balance and hearing. Regarding plaintiff's obesity, he is morbidly obese, being five feet nine inches tall and weighing at times as much as 361 pounds.

The plaintiff's medical history, which goes back several years before his alleged disability onset date, is set forth in the defendant's brief as follows:

> Plaintiff visited his primary care provider, Warren L. Jones, M.D., for treatment and mediation management related to a history of diabetes, high blood pressure, high cholesterol, gout, anxiety and depression, sleep apnea, and obesity, as well as urinary tract infections and upper respiratory infections (Tr. 331-880). Dr.

2

Jones repeatedly stressed the importance of weight loss (Tr. 377, 731, 787, 797, 800, 809).

In February 2004, Plaintiff complained of "inner ear" episodes where he felt dizzy and off balance (Tr. 331). Plaintiff reported three to four episodes a day, lasting three to four minutes, with no sensation of spinning or tinnitus (Tr. 331). An audiometric test was normal and Dr. Jones suspected that Plaintiff's symptoms were related to anxiety or a recent change in medication rather than an inner ear problem (Tr. 332).

In March 2007, Plaintiff complained of back pain after lifting (Tr. 418). X-rays of his lumbar spine showed no significant abnormality (Tr. 419). Two month later, Plaintiff reported left knee pain after crawling around on the floor (Tr. 834). X-rays of his left knee showed minimal spurring of the patella (Tr. 412). In August 2007, Plaintiff complained of left arm pain and nausea (Tr. 821). An exercise stress test was normal (Tr. 821). In November 2007, Plaintiff complained of back pain which was assessed as prostatitis (Tr. 816).

In May 2008, a physical therapy evaluation showed a normal range of motion, normal balance and coordination, 5/5 strength in both upper and lower extremities, 105 pounds of grip strength on the right, and 95 pounds of grip strength on left (Tr. 801-02). Plaintiff exhibited normal heel/toe standing and walking, a normal gait, and good balance (Tr. 802). Plaintiff had no problems climbing stairs or lifting 25-30 pounds frequently (Tr. 802).

Plaintiff reported foot pain in September 2008 (Tr. 367). X-rays of the left foot showed some arthritis but no bony abnormalities (Tr. 367). X-rays of the right foot revealed some spurring but nothing to explain right foot pain (Tr. 379). A chest x-ray was unchanged (Tr. 382).

In April 2009, Plaintiff reported significant back pain (Tr. 775). Upon examination, he had negative straight leg raises and a normal range of motion (Tr. 776). A magnetic resonance imaging (MRI) scan of Plaintiff's lumbar spine showed a disc protrusion at T12-L1 (Tr. 364). Plaintiff could return to work with a lifting restriction of 10 pounds (Tr. 363). Plaintiff visited a chiropractor for back pain and bilateral numbness and spasms in his hands between April 2009 and June 2009 (Tr. 281-83). Plaintiff was released to return to work in May 2009 (Tr. 766).

In August 2009, Plaintiff received treatment for a urinary tract infection, chest pain, and back pain (Tr. 219, 753-55). Chest x-rays showed no acute pulmonary disease (Tr. 219, 753-55). The following month, Plaintiff complained of dizziness when bent over and difficulty hearing (Tr. 747). He was advised to increase his fluid intake (Tr. 750). In November 2009, Plaintiff reported that his back was much better and he was going on a camping trip (Tr. 738). The next month, Plaintiff told Dr. Jones that he had a meltdown at work and was fired (Tr. 736).

In January and February 2010, Plaintiff complained of an abdominal rash and a gout flare-up (Tr. 728). X-rays of Plaintiff's feet showed mild osteoarthritic changes (Tr. 727, 732).

On February 24, 2010, Plaintiff had a motor vehicle accident while working as a truck driver (Tr. 220). In the emergency room, Plaintiff complained of back pain

3

and mid sternum pain, as well as left shoulder pain (Tr. 220, 222). X-rays of Plaintiff's chest and thoracic spine were negative (Tr. 227-28). X-rays of Plaintiff's lumbar spine showed degenerative changes and disc disease at L1-L2 with narrowing disk space (Tr. 230). X-rays of Plaintiff's shoulder showed no evidence of fracture or dislocation (Tr. 229).

The following month, Plaintiff attended a diabetes check-up with an endocrinologist (Tr. 719). He took his medication but was not compliant with his dietary restrictions (Tr. 719). Plaintiff was encouraged to exercise and consider weight loss surgery (Tr. 722).

In April 2010, Plaintiff reported continued left shoulder pain (Tr. 712). An MRI scan revealed edema, mild tendonitis, and osteoarthritis involving the AC joint (Tr. 231). Plaintiff also reported intermittent foot pain when walking for extended periods (Tr. 712). X-rays showed some arthritic changes in Plaintiff's feet (Tr. 712). Dr. Jones adjusted Plaintiff's medications and referred him to an orthopedic foot specialist (Tr. 712).

Plaintiff visited Dr. Jones in July 2010 with a urinary tract infection (Tr. 696-710). He reported continued left shoulder pain and frustration with worker's compensation (Tr. 696-97). The next month, Plaintiff reported hand tremors (Tr. 692). Plaintiff had difficulty using a mouse with his right hand due to spasms and numbness (Tr. 692). He has some vertigo earlier that month which had resolved (Tr. 692). Upon examination, Plaintiff had good flexion and extension of right arm, a good range of motion, and no appreciable numbness (Tr. 692).

At an appointment in August 2010 with H.W. Loveless, M.D., an ENT specialist, Plaintiff reported several episodes of spinning vertigo (Tr. 317). X-rays of his cervical spine showed mild levocurvature but no definite or significant degenerative changes (Tr. 341).

Plaintiff followed up with Dr. Jones in September 2010, reporting bilateral tremor in his hands and intermittent dizziness, vertigo type symptoms (Tr. 681). Dr. Jones referred Plaintiff to an ENT specialist and neurologist for further evaluation (Tr. 681).

On October 4, 2010, Plaintiff visited Douglass A. Wright M.D., a neurologist, with complaints of chronic left shoulder pain and numbness in his left hand (Tr. 270). Upon examination, Plaintiff had normal coordination, normal gait, and normal motor strength with some mild weakness in his left triceps (Tr. 271-72). Plaintiff had decreased sensation in fourth and fifth digit of left hand and a suppressed left triceps reflex (Tr. 273). Plaintiff could rise from a chair without difficulty (Tr. 272). An MRI scan of his cervical spine was normal with no evidence of spinal stenosis or cord contusion (Tr. 278).

In November 2010, Plaintiff received steroid medication for gout in his left foot (Tr. 677). Plaintiff told Dr. Wright that he experienced periodic dizziness when he turned to the left or lay in bed (Tr. 275). Dr. Wright suspected benign positional vertigo as Plaintiff did not have acute prolonged episodes of vertigo with hearing loss to suggest Meniere's disease (Tr. 275). A computed tomography (CT) scan of Plaintiff's chest showed no evidence of active disease process (Tr. 359). A nerve

4

conduction study showed some evidence of polyneuropathy in Plaintiff's upper extremities (Tr. 275).

Plaintiff visited the emergency room with sharp chest pain in December 2010 (Tr. 233-49). Plaintiff also reported that his left arm was sore from an accident in February and he was awaiting surgery (Tr. 248). Plaintiff's physical examination and laboratory tests were essentially normal (Tr. 234-49). A chest x-ray showed no evidence of active pulmonary disease (Tr. 242).

Later that month, Plaintiff visited T. Lisle Whitman, M.D., an orthopedic surgeon, for evaluation of his left shoulder (Tr. 888). Plaintiff had a limited range of motion compared to his right shoulder (Tr. 888). Dr. Whitman assessed left shoulder AC arthritis, rotator cuff tendinitis, and bicipital tendonitis and recommended an arthroscopic decompression surgery (Tr. 888).

A pre-op cardiac evaluation in January 2011 revealed some shortness of breath related to being overweight (Tr. 250). An exercise stress test was normal (Tr. 254).

Plaintiff had surgery on his left shoulder on January 18, 2011 (Tr. 255-56). He began physical therapy in February 2011 and reported improvement following surgery (Tr. 258). At his initial physical therapy visit, Plaintiff rated his pain a 2 out of 10 and he stated that he was independent in his daily activities other than overhead (Tr. 258). In April 2011, Plaintiff had some numbness in his left hand and fingers which resolved with proper posture and cervical alignment (Tr. 257). Plaintiff had a good range of motion but needed to increase his strength (Tr. 257). By May 2011, Plaintiff had a full passive range of motion and increased strength (Tr. 262). Plaintiff was released to return to work with a 15 pounds lifting restriction and no overhead work with left arm (Tr. 895). At a follow-up appointment with Dr. Whitman in July 2011, Plaintiff's left arm was weak compared to the right, but he had no shoulder instability (Tr. 883). Dr. Whitman restricted Plaintiff to no overhead work with his left arm (Tr. 893).

In March 2011, Plaintiff visited Dr. Loveless with complaints of dizziness, lasting two to three minutes at a time (Tr. 312-16). Upon examination, Plaintiff's hearing was subjectively adequate with appropriate responses to verbal commands given in normal conversation and tone (Tr. 316). An audiogram was normal with 100 percent speech discrimination bilaterally (Tr. 316). In April 2011, an electrocochleography test was positive on the right side (Tr. 310). Dr. Loveless assessed Plaintiff with Meniere's disease (Tr. 311).

When Plaintiff returned to see Dr. Jones in April 2011, he reported that he felt fine taking medication with no dizziness or lightheadedness (Tr. 647). He had no chest pain, no arm pain, and no confusional episodes, and stated that his medication worked well (Tr. 647). Plaintiff appeared worried about his ability to work with a diagnosis of Meniere's disease because he only had high school education and truck driving was all he knew (Tr. 647).

In May 2011, Plaintiff followed up with Dr. Loveless, reporting improvement with medication and a low sodium diet (Tr. 302-06). An MRI scan of Plaintiff's brain showed increased signal within white matter of cerebral hemispheres (Tr. 293,

5

298-99). Dr. Loveless's differential diagnosis included ischemic small vessel disease, migraine, and demyelinating disease (Tr. 293, 298-99, 453). Dr. Loveless explained that Plaintiff would not be able to pass a DOT physical with Meniere's disease and would not be able to work as a truck driver (Tr. 293).

Plaintiff also visited Dr. Wright with complaints of hand tremors and numbness in May 2011 (Tr. 266). Plaintiff reported improvement in neck pain and numbness, and no severe vertigo attacks (Tr. 265-66). He denied hearing loss or tinnitus (Tr. 266). A physical examination showed normal coordination, normal gait, and normal motor strength except for minimal weakness in his left triceps (Tr. 268).

Plaintiff returned to see Dr. Loveless in June 2011, indicating that his dizziness improved greatly with low sodium diet and medication (Tr. 292). Plaintiff reported right hand numbness and tremors, memory changes, and dizziness (Tr. 292-93). A transcranial doppler test was normal (Tr. 1052). Dr. Loveless counseled Plaintiff regarding his diagnoses and ramifications, and advised Plaintiff to consider a weight loss program (Tr. 297).

On June 22, 2011, Plaintiff followed up with Dr. Whitman with continued left shoulder pain and concern regarding his ability to return to work (Tr. 882). Upon examination, Plaintiff had an improved range of motion, slight weakness to overhead press on left compared to right, and good internal and external rotation strength bilaterally (Tr. 882). His left shoulder was not particularly tender or unstable (Tr. 882). Plaintiff received a steroid injection (Tr. 882).

The next day, Plaintiff visited Dr. Wright with reports of improvement in his left arm numbness, tremor, twitching, and weakness, and about 50% improvement in right hand numbness with medication (Tr. 1046-47). Plaintiff also reported improved cognitive functioning, stating that he could think fast and multitask more (Tr. 1047). Plaintiff denied hearing loss or tinnitus (Tr. 1048). Upon examination, Plaintiff had normal motor strength with minimal weakness in left triceps and minimal, if any, tremor (Tr. 1049). Plaintiff had normal coordination and normal sensation other than numbness in his left hand (Tr. 1049).

In July 2011, Plaintiff reported left arm pain and back pain (Tr. 1406). X-rays of Plaintiff's lumbar spine showed mild spondylosis (Tr. 1418). An MRI scan of his lumbar spine showed disc degeneration at T12-L1 and broad-based disc protrusion at L2-L3, L4-L5, and L5- S1 with no definite nerve root compression (Tr. 1399).

On August 2, 2011, Plaintiff attended a consultative examination with Kenton Goh, M.D. (Tr. 900-09). Plaintiff exhibited normal grip strength, intact sensation, normal range of motion, and decreased reflexes in his upper and lower extremities (Tr. 902). Plaintiff walked with an even gait, good speed, and good balance (Tr. 902). He could tandem walk and heel walk fairly easily, but toe walking caused discomfort (Tr. 902). Plaintiff could stand upright on both legs and stand on one leg with moderate balance difficulty (Tr. 903). Plaintiff could squat about half way (Tr. 903). He had normal range of motion in his shoulders, elbows, wrists, knees, and ankles (tr. 903). His hip flexion was limited by obesity (Tr. 903). Dr. Goh opined that Plaintiff could lift and carry up to 50 pounds occasionally and 20 pounds frequently; sit for 3 hours at a time, 7 hours total in an 8-hour workday; and stand and walk for

6

2 hours at a time, 6 hours total in an 8-hour workday (Tr. 905). Plaintiff had unlimited use of his right arm but was limited to frequent reaching, handling, fingering, feeling, and pushing/pulling with his left (Tr. 905-06). Plaintiff could frequently climb stairs, occasionally climb ladders or scaffolds and balance, and never stoop, kneel, crouch, or crawl (Tr. 906). Plaintiff could never tolerate exposure to unprotected heights but could occasionally handle mechanical parts and frequently operate a motor vehicle (Tr. 907).

On September 8, 2011, Plaintiff attended a psychological evaluation with B. Wayne Lanthorn, Ph.D. (Tr. 910-18). Plaintiff reported that his wife primarily did the household chores and he spent his days watching television and on the internet (Tr. 912). A mental status evaluation revealed signs of depression and a mixed affect (Tr. 912). Dr. Lanthorn assessed mood disorder with major depressive-like episode, moderate to severe due to chronic physical pain (Tr. 914).

On September 14, 2011, C. Bancoff, M.D., a state agency medical consultant, reviewed the record and opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for about 6 hours, and sit about 6 hours (Tr. 68). Plaintiff had occasional postural limitations, no manipulative limitations, and no communicative limitations (Tr. 68-70). Plaintiff should avoid hazards, extreme cold, and extreme heat (Tr. 71). Denise
Bell, M.D., affirmed this assessment on October 24, 2011 (Tr. 978).

Plaintiff visited Dr. Loveless on September 14, 2011 with complaints of severe spinning episodes when turning his head or looking up (Tr. 1091). Plaintiff indicated that his episodes were not as bad as last spring (Tr. 1091). He also stated that his hearing was getting worse with a high pitched ring on the left side (Tr. 1091). He only took his vertigo medication occasionally (Tr. 1092). Overall, his dizzy spells were much better (Tr. 1092).

When Plaintiff returned to see Dr. Jones on September 22, 2011, he reported significant pain following a functional capacity evaluation and a recent episode of severe room spinning (Tr. 975). Plaintiff said that he was on his riding lawnmower when he felt dizzy, had to stop, and had difficulty walking straight (Tr. 976).

In October 2011, Plaintiff complained of pain all over, including his hips, knees, back, left shoulder, and left foot (Tr. 1386). He was not taking his gout medication and he had no significant joint swelling and a normal range of motion (Tr. 1386, 1389). The following month, Plaintiff had a normal range of motion, normal grip strength in his hands, a normal gait, and normal balance (Tr. 1022). Plaintiff was not taking his gout medication in December 2011 and received a steroid injection for a gout flare-up (Tr. 1367-68).

On December 5, 2011, Plaintiff visited Dr. Otakar Kreal, M.D., a neurologist, with complaints of mild left arm weakness and numbness, and hand tremors (Tr. 1042). Plaintiff reported Meniere's disease attacks once or twice a month which lasted a few minutes, never hours or days (Tr. 1043). He also reported pulsating tinnitus in both ears three to four times a week (Tr. 1043). Plaintiff's hand tremor was very mild, easily tolerable, and not evident during the examination (Tr. 1042, 1044). Plaintiff had normal strength in his right upper extremity and lower

7

extremities, and minor weakness in his left triceps (Tr. 1044). He had a normal gait and normal sensation except numbness in the fourth and fifth digits of left hand (Tr. 1044).

In January 2012, Plaintiff told Dr. Loveless that his dizziness was getting more frequent, but not more severe (Tr. 1058). He was not taking his Meniere's disease medication at the time (Tr. 1059). Plaintiff's hearing appeared adequate upon examination (Tr. 1062).

The following month, Plaintiff had a gout flare-up in his left ankle/foot (Tr. 1355). He was not taking his medication as prescribed (Tr. 1355).

In March 2012, Plaintiff told Dr. Jones that moving his head or changing computer screens too fast exacerbated his spinning sensations (Tr. 1008-09). He also thought he had increased hearing loss in his right hear (Tr. 1009). An MRI scan of Plaintiff's brain was unchanged (Tr. 1071). An MR angiogram was within normal limits (Tr. 1082). Plaintiff also reported leg pain after trying to use the riding lawnmower (Tr. 1000).

In April 2012, Plaintiff told Dr. Kreal that his left arm pain increased after lifting (Tr. 1039). Dr. Kreal noted mild weakness and numbness in left arm (Tr. 1039). Plaintiff's tremor was only mild and not bothersome (Tr. 1039). Physical examinations showed no tremor, negative straight leg raises, normal strength, and pain with range of motion testing (Tr. 1317, 1040). Later that month, Plaintiff told Dr. Loveless that his spinning episodes were getting worse and he could not watch action movies or racing on television and had trouble with computer screens (Tr. 1065). Plaintiff's hearing was adequate with appropriate responses to verbal commands given in normal conversational volume and tone (Tr. 1068).

The following month, Plaintiff reported that he injured his back helping an elderly man shovel some dirt (Tr. 991). An MRI scan of his spine showed small disc extrusions with no discrete cord compression (Tr. 993). Plaintiff asked Dr. Jones for codeine, stating that his back pain woke him up at night (Tr. 988).

In July 2012, Plaintiff reported joint pain in his knees, wrists, and shoulders (Tr. 1250-51). Upon examination, he had a full range of motion, no crepitus, and no effusion (Tr. 1251). X-rays showed osteoarthritis in both knees (Tr. 1210). Plaintiff also reported thoracic pain after helping an elderly man with scooping dirt and digging (Tr. 1097). He requested an inner ear perfusion due to continued complaints of dizziness, and reported a seasonal allergy flare-up after mowing the lawn (Tr. 1175-76). His hearing was adequate (Tr. 1177).

On August 6, 2012, Plaintiff told Dr. Kreal that his episodes of vertigo lasted seconds to minutes, never more than 24 hours, and were induced by head turning or bending up and down (Tr. 1190). Plaintiff also had a mild tremor which was still tolerable (Tr. 1190-91). His memory problems had improved with medication (Tr. 1190). Plaintiff reported minor numbness in left forearm, hand, and fingers, but was functioning well (Tr. 1191). He also reported a ringing in right ear independent of his spinning episodes (Tr. 1191). A physical examination showed intact hearing, normal strength, normal coordination, and normal gait (Tr. 1192). Plaintiff received a tube and medication in his right ear due to an infection (Tr. 1163-74, 1216). His ear

8

pain returned after the tube was removed (Tr. 1211).

[Doc. 18, pgs. 2-13].

On September 6, 2012, a hearing was held before the ALJ. After the plaintiff testified, the ALJ took the testimony of Ms. Cathy Sanders, a vocational expert ["VE"]. He asked her "to assume that he [plaintiff] is physically restricted to sedentary work with no climbing of ladders, ropes or scaffolds, no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching or crawling. Assume that he cannot perform more than occasional pushing, pulling, reaching, handling or fingering with the left upper extremity and that includes overhead reaching. Assume that he can't have any exposure to unprotected heights or hazards, mentally assume that he is able to perform and maintain concentration for simple, routine, repetitive tasks, adapt to infrequent changes in a work setting, and finally that he's limited to work that requires no more than occasional public interaction." When asked if there were jobs that the plaintiff could perform with these limitations at his age and with his educational and vocational background, Ms. Sanders identified the jobs of surveillance system monitor with 800 in Tennessee and 45,000 in the United States; a document preparation worker with 1,400 in Tennessee and 46,000 in the country; one-fourth of entry level office clerk jobs with 1,000 in the state and 18,000 in the nation. His attorney asked if those jobs would require a person to stay at their workstation and not "allow you to get up or move about or have a...sit, stand option..?" She stated that "it's possible you could lose attention if you got up more than maybe one time an hour...," thus implying that if he had to get up more often he would not be a good candidate for those jobs. (Tr. 54-56).

On October 2, 2012, the ALJ rendered his hearing decision. He found that the

9

plaintiff had the impairments "that are severe in combination" set forth hereinabove. (Tr. 22). He found that the plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. As stated in 20 CFR § 404.1520(d), if the plaintiff met or equaled one of the listed impairments, the Commissioner "will find you disabled without considering your age, education, and work experience." He stated that "this is consistent with the State Agency opinion." He went on to state that none of the plaintiff's mental impairments met or equaled listings 12.04 and 12.06. He then went on to explain how plaintiff's mental picture failed to meet the required levels of severity to meet or equal those named listings. (Tr. 23). This was his entire discussion of listed impairments.

He then proceeded to find that the plaintiff had the residual functional capacity ["RFC"] "to perform sedentary work..., with no climbing ladders, ropes and scaffolds; occasional combing ramps and stairs, balancing, stooping, kneeling, crouching, crawling, pushing/pulling with the left upper extremity and reaching, handling or fingering with the left upper extremity; no exposure to unprotected heights or hazards. He is able to perform simple, routine, repetitive tasks; able to maintain concentration and persistence for simple, routine, repetitive taks; able to adapt to infrequent changes in a work setting; and limited to work that requires no more than occasional interaction with the public." (Tr. 23-34).

He then recounted the conditions upon which the plaintiff based his claim for disability, which are "active Meniere's disease; type 2 diabetes millitus; diabetic neuropathy in feet, legs and hands; chronic gout; degenerative disc arthritis in lower back; protruding disc in middle back; arthritis in shoulder; osteoarthritis in left foot; anxiety and depression

10

and high blood pressure." He stated "at a height of 5 foot 9 inches, the claimant weighs 340 pounds." The ALJ noted that plaintiff said that truck driving was the only job skill he had, and that with the Meniere's disease, plaintiff maintained he could not drive commercially or do any type of physical labor. (Tr. 24).

The ALJ then discussed the medical evidence in great detail for several pages in his opinion (Tr. 25-30). Included in this was a discussion of the opinion of Dr. Goh, the consultative examiner. He noted that Dr. Goh stated that the plaintiff could only "squat down about halfway." He also recounted Dr. Goh's assessment, including that the plaintiff "could not stoop, kneel, crouch or crawl..." (Tr. 29). He discussed the State Agency doctor's physical report, which found that the plaintiff could occasionally stoop, kneel, crouch and crawl. (Tr. 30). He stated he gave "some weight" to both the DDS physician and Dr. Goh. He noted that the plaintiff was "more limited" than the DDS physician found him to be, stating that his opinion did not consider the plaintiff's subjective complaints and his obesity. He gave great weight to the mental evaluators at the State Agency level and to Dr. Lanthorn who conducted the consultative mental evaluation. He discussed plaintiff's obesity, noting his duty to consider the "additional and cumulative effects of obesity" on plaintiff's other impairments. (Tr. 31).

He then discussed the use of the Medical-Vocational Guidelines (the "Grid") as a framework for decision. He noted that under Rule 201.21, a younger individual capable of sedentary work with plaintiff's education and vocational experience would be "not disabled." However, since the plaintiff had additional limitations which precluded a full range of sedentary work, he reviewed the opinion of the VE. Based upon the jobs she identified

11

which the plaintiff could perform with the ALJ's found RFC, he determined that there were a substantial number of jobs which the plaintiff could perform, and that he was not disabled. (Tr. 32).

Before discussing the plaintiff's various assertions of error, the Court would point out that at present, with the plaintiff being age 51 and thus in the category of "closely approaching advanced age," he now would be disabled under Grid Rule 201.14. He turned 50 years of age on February 5, 2014. Under Rule 201.14, a person aged 50 to 54 limited to sedentary work, with a high school education, and having past relevant work which was skilled or semiskilled with skills not transferable (the same in all respects except age as Rule 201.21 mentioned by the ALJ), is "disabled" as a matter of law. However, he was 46 on his alleged onset date, and 48 at the time the ALJ rendered his hearing decision.

Plaintiff first asserts that the ALJ failed to properly consider the plaintiff's Meniere's disease and how it "impacts both the listing of impairments and the residual functional capacity." Regarding the listing of impairments, plaintiff states that the effects of his Meniere's disease meets or equals Listing 2.07. That listing specifically requires:

> Disturbance of ladyrinthine-vestibular function (including Meniere's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:
>
> A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
>
> B. Hearing loss established by audiometry.

Plaintiff relies upon *Reynolds v. Commissioner of Soc. Sec.*, 424 F. App'x 411 (6th Cir. 2011). In that case, the Court found that the ALJ did not provide an analysis regarding the

12

reasons the why the plaintiff's back condition did not meet section 1.04 of the listings. The Court found that this error was not harmless because it deprived the Court of an ability to make "meaningful judicial review," and characterized the step three analysis as "hopelessly inadequate." However, this was after the plaintiff had put forth evidence that she met that listing. *Id.*, at 416, *citations omitted. Reynolds* is a troubling case, that has perhaps opened the proverbial "can of worms." Taken at its broadest, it could be said to require an ALJ to scour the listings and discuss one by one why a plaintiff's ailments do not meet any of them which could arguably apply. Several courts have distinguished the holding, including the Sixth Circuit in *Forrest v. Commissioner of Soc. Sec.,* 2014 WL 6185309 (6th Cir. 2014) which says that such an error is harmless if the plaintiff does not show that the impairments meet or equal a listed impairment. In a situation more analogous to the case at bar, *Sheeks v. Commissioner of Soc. Sec.*, 544 Fed. Appx. 639 (6th Cir. 2013), the ALJ did not discuss listing 12.05(C). The Court states "[i]n defense of the ALJ, Sheeks did not mention the listing in the administrative proceeding." *Id.*, at 641. Also, the Court stated "[t]he relevant regulations require the ALJ to find a claimant disabled if he meets a listing. Yet they do not require the ALJ to address every listing-and with ample reason. There are a hundred or so listings. In the normal course, as a result, the ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Id.*

Here, the listing was never mentioned at the hearing. Also, plaintiff's Meniere's disease was only mentioned briefly by the plaintiff during examination by the ALJ (Tr. 46). The plaintiff indicated his back pain and foot numbness were far more debilitating than his

13

Meiere's disease. The Court can certainly understand why the ALJ did not discuss this listing.

However, in deference to *Reynolds, supra*, the proof does not support all of the elements of Listing 2.07 being shown. As stated by the Commissioner, "plaintiff's treatment notes repeatedly documented 'good' balance and no reports of falls (Tr. 28, 29, 246, 654, 667, 802, 902, 1022, 1044, 1053, 1286, 1382, 1413, 1427). While plaintiff complained of periodic dizziness, the record shows that his symptoms improved with a low sodium diet and medication (Tr. 275, 292, 976, 1091, 1059)." [Doc. 18, pg. 17]. Also, plaintiff reported to his doctors that the episodes only lasted a few seconds or minutes and happened only once or twice a month (Tr. 1043, 1190). When he reported more frequent dizziness in January 2012, he admitted to not taking his prescribed medications (Tr. 1058-1059). Also lacking were confirmation of problematic tennitus and loss of hearing. In fact, his audiogram in March 2011 was normal (Tr 316), and this was noted by the ALJ (Tr. 28).

In the opinion of the Court, the evidence does not establish that the plaintiff met or equaled Listing 2.07, or any other listing. The ALJ's failure to specifically address them, even in hindsight, is thus excused.

Plaintiff also asserts that the ALJ erred in evaluating the impact of plaintiff's Meniere's disease in making his RFC finding. Specifically, he argues that he could not perform the very jobs identified by the VE. This is because the plaintiff told his doctor on April 27, 2012, that "he is unable to watch action movies or racing on TV and has trouble with computer screens (Tr. 1065)." Thus, plaintiff reasons, he could not perform work as a surveillance system monitor, a document preparation worker, and as an entry level office

14

clerk.  However, in his function report submitted when he applied for benefits, he stated that he shopped "by computer," and that he shopped for "miscellaneous things from computer..." (Tr. 173).  In the same form, he identified his favorite "hobby or interest" as watching television.  (Tr. 174).  He told Dr. Lanthorn at his consultative mental examination that for daily activities, "he watches television and does something on the internet."  (Tr. 912).  While watching a particular action film or cars racing at 200 miles per hour might make the plaintiff dizzy, it obviously does not stop him from doing more mundane things like watching most things on television and getting on the internet.  Likewise, the identified jobs would not appear to be precluded by the described symptoms.  Monitoring a video surveillance system would not seem to require watching anything approaching the intensity of action films or racing.  The VE even said that 1,000 regional and 18,000 national entry level office clerk jobs would not even require any use of a computer.

   The ALJ factored the Meniere's disease extensively into his RFC finding.  The claimed problem with viewing certain things on a screen does not appear to the Court to have been a necessary, much less critical omission, from the RFC finding.

   Next, plaintiff asserts that the plaintiff "did not fully evaluate" his hand limitations.  While the ALJ in his RFC finding limited the plaintiff in the use of his left upper extremity, he asserts the ALJ erred in not finding a severe impairment in the plaintiff's right hand and including this in the RFC finding.  There are references in the record of tremors or spasms in both hands.  However, the treating doctors described these as "easily tolerated" and "not bothersome." (Tr. 1039, 1042, 1049, 1190 and 1191).  He consistently had normal motor strength and sensation in his right arm (1044, 1049).  Dr. Goh found no limitations in the

15

plaintiff's right hand in his consultative examination (Tr. 905-906). The ALJ did not err in failing to find and include in the analysis that the plaintiff had a severe impairment in his right hand.

The final and most serious point of error raised by the plaintiff is that the ALJ erred in adequately evaluating the effects of plaintiff's obesity both in "meeting or equaling any of the Listing of Impairments" and in making his RFC finding. Plaintiff cites first the requirements of Social Security Ruling ["SSR"] 02-01p. When obesity itself was removed as a listed impairment, this SSR was issued to show how obesity was still a factor to be seriously considered at all stages of the benefit determination process, including the effect of obesity on an individuals meeting or equaling a listing at step three, and in steps four and five regarding residual functional capacity and whether the person can be expected to engage in substantial gainful activity.

In the present case, the ALJ considered the plaintiff's obesity in adjudicating the plaintiff's claim. He recited the general role of obesity in this process (Tr. 31), setting out how obesity can complicate other conditions and make them more serious than they would be in the absence of obesity. Likewise, he specifically found that obesity was one of the plaintiff's medically determinable impairments at step two, which in combination with other impairments satisfied the requirement of step two that a claimant have a severe impairment. (Tr. 22). In explaining his RFC determination, he pointed out that the plaintiff was morbidly obese. (Tr. 25). Likewise, he gave less weight to the State Agency physicians and somewhat less weight to Dr. Goh because the ALJ's perceptions regarding the plaintiff's obesity caused him to find the plaintiff more limited in some respects than the doctors did.

16

If the sole issue was whether the ALJ properly considered obesity as a whole, then this would end the matter. However, it does not.

SSR 96-9p deals with "implications of a residual functional capacity for less than a full range of sedentary work." To state the obvious "an RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare." *Id.* In the present case, the ALJ found that plaintiff is only capable of a reduced range of sedentary work. The ruling goes on to state that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of 'disabled.' If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do..." *Id.*

Dr. Goh, on August 2, 2011, found after his examination that the plaintiff could never, stoop, kneel, crouch or crawl. (Tr. 906). Dr. Goh apparently based this finding upon an observation during the examination of the plaintiff that he "is able to squat down about halfway. He stated that he has some difficulty with his knees and ankles when he tried to go any lower than that. He only held that position for about three seconds before he stepped back up." SSR 96-9p goes on to state "[a]n ability to stoop occasionally; i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations. A *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary

17

work. Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stopping." *Id.*

Thus, if plaintiff could never stoop, he should be found disabled. The only examining source who rendered an opinion observed the plaintiff unsuccessfully attempt to squat, and stated that he could *never* stoop. The Commissioner responds to plaintiff's argument in this regard stating that the ALJ only gave Dr. Goh "some weight." The ALJ found that the plaintiff could occasionally stoop, indicating that he disagreed with Dr. Goh in some respects. However, the hearing decision says the ALJ only gave some weight to Dr. Goh because his opinion "did not consider the claimant's subjective complaints, including obesity...," not because he found the plaintiff could never stoop.

There is of course the opinion of Dr. Bancoff, the State Agency non-examining doctor, who on August 22, 2011, opined that the plaintiff could "occasionally" stoop (Tr. 69). Curiously, at another place on the form he was asked if there was a medical source statement (Dr. Goh's). Dr. Bancoff checked "yes." When asked if there were medical source conclusions which were "significantly" different from Dr. Bancoff's, he checked "no." (Tr. 73). Regarding Dr. Bancoff's opinion, the ALJ once again only gave it "some weight," finding that the State Agency doctor, like Dr. Goh, "did not consider the claimant's subjective complaints, including obesity..." and that "evidence received at the hearing level shows that the claimant is more limited than determined..." by Dr. Bancoff. (Tr. 31).

The Court is thus admittedly confused. Did the ALJ base his finding that the plaintiff could occasionally stoop on Dr. Bancoff while generally believing that Dr. Bancoff was not cognizant of the effects of plaintiff's obesity and his physical limitations caused by it? Why

18

did he adopt so many of Dr. Goh's findings, but not the one on stooping, while saying Dr. Goh did not adequately consider the plaintiff's obesity? Stooping is made a primary issue by SSR 96-9p, and the Court is totally in the dark as to why the ALJ rejected the examining physician. It is of course true that an ALJ need not agree with all findings of a particular doctor. It is likewise true that a State Agency doctor's opinion can be found more persuasive than that of a consulting, or in some cases, a treating physician. However, here a well-supported opinion of a physician who eyeballed and examined a claimant face to face would be entitled to more credence about the ability to stoop than one who only looked at medical records. The Court thus finds no explanation, much less a satisfactory one, for the ALJ's finding that the plaintiff could occasionally stoop, and SSR 96-9p says what it says.

It is true that this SSR says consultation with a vocational resource may be useful for cases where the individual is limited to less than occasional stooping. However here, the VE was told that the plaintiff could occasionally stoop. With the record as it now stands, there is not substantial evidence to support the ALJ's finding that Mr. Buchanan could occasionally stoop. Thus the findings are not substantially justified.

As stated previously, Mr. Buchanan is severely limited, and would be disabled at his age with the ALJ's RFC under the Medical-Vocational Guideline rules. Because of this, the case demands a speedy resolution. The Court recommends that the case be remanded, and that a VE be asked if there are jobs which the plaintiff could perform if he were incapable of stooping. It is therefore recommended that the plaintiff's Motion for Summary Judgment

19

be GRANTED, and the defendant's Motion for Summary Judgment be DENIED.[1]

                Respectfully submitted,

                                  s/ Dennis H. Inman
                                United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).
20